Brandon J. Witkow (SBN 210443)
bw@witkowlaw.com
witkow | baskin
21031 Ventura Boulevard, Suite 700
Woodland Hills, California 91364
Tel:  818.296.9508

Cole Mackey (Admitted *Pro Hac Vice*)
cole@mackey.legal
Mackey Law Firm PLLC
9525 Katy Freeway, Suite 260
Houston, TX 77024
Tel:  346.954.8287

Attorneys for *Defendants*
NICHOLAS PATRICK KARLL & ECO-PACKAGING
SOLUTIONS, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IMPRENTA SERVICES, INC., a Texas corporation; MIKE SANCHEZ, an individual,<br><br>                    Plaintiff,<br><br>          v.<br><br>NICHOLAS PATRICK KARLL, an individual, ECO-PACKAGING SOLUTIONS, INC., a California corporation; and DOES 1-10, inclusive,<br><br>                    Defendants. | Case No.: 2:20-cv-06177-GW-PVC<br><br>**DEFENDANTS' NOTICE OF MOTION & MOTION FOR ATTORNEY'S FEES AND DAMAGES**<br><br>Hon. Judge George H. Wu<br><br>Hearing:<br><br>Date:  June 30, 2022<br>Time: 8:30 a.m.<br>Ctrm: 9D |

**TO PLAINTIFF AND ITS ATTORNEY OF RECORD:**

**PLEASE TAKE NOTICE** that on **June 30, 2022** at 8:30 a.m. or as soon thereafter as the matter may be heard in Courtroom 9D of the United States District Court for the Central District of California, located at 350 W. 1st Street, 9th Floor, Los Angeles, California 90012, Defendants Nicholas Patrick Karll and Eco Packaging Solutions, Inc. (together, "Defendants") will and hereby do move the Court for an award of monetary sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure, and for an award of damages, including enhanced damages, owing to Plaintiffs' willful infringement of U.S. Patent No. 10,513,375 ("the '375 Patent").

Defendants make this motion pursuant to the Court's Final Order (Dkt. No. 95) granting Defendants' Partial Motion for Summary Judgment of Correct Inventorship and No Inequitable Conduct (Dkt. No. 69), granting in part Defendants' Motion for Sanctions Pursuant to Fed. R. Civ. Proc. 11 (Dkt. No. 73), and granting Defendants' Partial Motion for Summary Judgment of Infringement and Willfulness (Dkt. No. 76).

This motion is based on this Notice of Motion and Motion, the concurrently filed Memorandum of Points and Authorities in Support of Defendants' Motion for Attorney's Fees and Damages, the concurrently filed declarations and exhibits, the concurrently lodged [Proposed] Order Granting Defendants' Motion for Attorney's Fees and Damages, the files and records in this action, and any such additional arguments or materials as may be submitted to the Court before the time of the decision in this matter.

1

2     Dated: June 3, 2022                    Respectfully submitted,

3
                                             witkow | baskin
4                                            Mackey Law Firm PLLC

5
                                             By: /s/ Michael C. Mackey
6                                            Brandon J. Witkow
7                                            Cole Mackey

8
                                             *Attorneys for Defendants*
9                                            NICHOLAS PATRICK KARLL & ECO
10                                           PACKAGING SOLUTIONS

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MOTION FOR ATTORNEY'S FEES AND DAMAGES**

# TABLE OF CONTENTS

I.   INTRODUCTION ..................................................................................... 1

II.  DEFENDANTS' COSTS AND FEES FOR FILING THEIR MSJ OF
CORRECT INVENTORSHIP AND NO INEQUITABLE CONDUCT AND
THEIR MOTION FOR SANCTIONS................................................................ 2

III. DAMAGES ............................................................................................ 3

  A.    REASONABLE ROYALTY DAMAGES ............................................. 3

    GEORGIA-PACIFIC FACTOR NO. 1.................................................. 6

    GEORGIA-PACIFIC FACTOR NO. 2.................................................. 6

    GEORGIA-PACIFIC FACTOR NO. 3.................................................. 6

    GEORGIA-PACIFIC FACTOR NO. 4.................................................. 7

    GEORGIA-PACIFIC FACTOR NO. 5.................................................. 7

    GEORGIA-PACIFIC FACTOR NO. 6.................................................. 8

    GEORGIA-PACIFIC FACTOR NO. 7.................................................. 8

    GEORGIA-PACIFIC FACTOR NO. 8.................................................. 9

    GEORGIA-PACIFIC FACTOR NO. 9................................................ 10

    GEORGIA-PACIFIC FACTOR NO. 10.............................................. 10

    GEORGIA-PACIFIC FACTOR NO. 11.............................................. 10

    GEORGIA-PACIFIC FACTOR NO. 12.............................................. 11

    GEORGIA-PACIFIC FACTOR NO. 13.............................................. 11

    GEORGIA-PACIFIC FACTOR NO. 14.............................................. 12

    GEORGIA-PACIFIC FACTOR NO. 15.............................................. 12

  B.    LOST PROFITS DAMAGES ........................................................... 13

    PANDUIT FACTOR NO. 1 ............................................................. 14

    PANDUIT FACTOR NO. 2 ............................................................. 14

    PANDUIT FACTOR NO. 3 ............................................................. 15

    PANDUIT FACTOR NO. 4 ............................................................. 15

IV.  ENHANCED DAMAGES ....................................................................... 16

i

A.   LITIGATION MISCONDUCT ....................................................... 17

B.   SIZE AND FINANCIAL CONDITION ........................................ 18

C.   DURATION OF MISCONDUCT ................................................. 18

D.   MOTIVATION FOR HARM ........................................................ 19

E.   ATTEMPT TO CONCEAL MISCONDUCT ............................... 19

F.   SUMMATION ................................................................................ 20

V.   INJUNCTION ........................................................................................ 20

A.   IRREPARABLE HARM ............................................................... 21

B.   INADEQUATE REMEDIES AVAILABLE AT LAW ............... 21

C.   BALANCE OF HARDSHIPS ....................................................... 22

D.   THE PUBLIC INTEREST ............................................................ 23

VI.   CONCLUSION ..................................................................................... 23

# TABLE OF AUTHORITIES

**Cases**

*Apple Inc. v. Samsung Elecs. Co*., 695 F.3d 1370 (Fed. Cir. 2012) ........................ 21

*CAO Lighting, Inc. v. Feit Elec. Co.*, 2022 U.S. Dist. LEXIS 91642 (C.D. Cal.
February 14, 2022)................................................................................................ 5

*eBay Inc. v. MercExchange, L.L.C*., 547 U.S. 388, 126 S. Ct. 1837, 164 L. Ed. 2d
641 (2006) .......................................................................................................... 21

*Funai Elec. Co. v. Daewoo Elecs. Corp*., 593 F. Supp. 2d 1088 (N.D. Cal. 2009),
*aff'd*, 616 F.3d 1357 (Fed. Cir. 2010) ................................................................ 19

*Georgia-Pacific Corp. vs. United States Plywood Corp*., 318 F. Supp. 1116 (SDNY
1970) ................................................................................................................... 5

*i4i Ltd. P'ship v. Microsoft Corp*., 598 F.3d 831 (Fed. Cir. 2010) ............. 18, 21, 22

*Imprenta Servs., Inc. v. Karll, et al.*, No. 2:20-cv-01583 (C.D. Cal. filed Feb. 18,
2020) ................................................................................................................... 1

*Juno Therapeutics, Inc. v. Kite Pharma, Inc*., 2020 U.S. Dist. LEXIS 83014 (C.D.
Cal. Apr. 2, 2020) ............................................................................................. 19

*Mentor Graphics Corp. v. EVE-USA, Inc*., 851 F.3d 1275 (Fed. Cir. 2017)........... 14

*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc*., 575 F.2d 1152, 197 U.S.P.Q 424
(6th Cir.1979)...................................................................................................... 14

*Pavo Solutions Llc v. Kingston Tech. Co*., 2021 U.S. Dist. LEXIS 139185 (C.D.
Cal. February 16, 2021) ................................................................................... 19

*Read Corp. v. Portec, Inc*., 970 F.2d 816 (Fed. Cir. 1992)................................ 17, 20

*Rsa Protective Techs. v. Delta Sci. Corp*., No. CV19-6024, 2021 U.S. Dist. LEXIS
209396 (C.D. Cal. Oct. 20, 2021)..................................................................... 17

*Sionyx LLC v. Hamamatsu Photonics K.K*., 981 F.3d 1339 (Fed. Cir. 2020) ......... 21

*Sunoco Partners & Mktg. Terminals L.P. v. U.S. Venture, Inc*., 2022 U.S. App.
LEXIS 11662, 32 F.4th 1161 (Fed. Cir. 2022)................................................. 14

iii

*Top Lighting Corp. v. Linco, Inc.*, 2019 U.S. Dist. LEXIS 239303 (C.D. Cal.

   August 26, 2019) ........................................................................... 19, 20

**Statutes**

35 U.S.C. § 256 ...................................................................................... 1

35 U.S.C. § 283 .................................................................................... 21

35 U.S.C. § 287 .................................................................................... 22

**Rules**

Fed. R. Civ. P. 11 ........................................................................ 1, 2, 18

witkow | baskin

**MOTION FOR ATTORNEY'S FEES AND DAMAGES**

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.  INTRODUCTION

On July 10, 2020,[1] Plaintiffs filed this action seeking declaratory judgments of non-infringement and inequitable conduct in connection with U.S. Patent No. 10,513,375 ("the '375 Patent"), and to have Plaintiff Sanchez declared the sole inventor or a co-inventor of the '375 Patent under 35 U.S.C. § 256. *See generally* Doc. No. 1 ("Complaint").  Three months *before this action was filed*, Defendants' counsel sent a letter to Plaintiffs' counsel explaining, *inter alia*, the baselessness of Plaintiffs' inventorship and inequitable conduct claims and attaching key evidence in support of that explanation, which evidence had been known to Plaintiffs themselves since December 2017. *See* Dkt. No. 14-1, pp. 28-39 (of 72).

Defendants reiterated their warning with a draft sanctions motion, served July 27, 2021, under the safe harbor provision of Fed. R. Civ. P. 11 ("Rule 11"). *See* Dkt. No. 73-1, pp. 5-36 (of 36).  All the while, Plaintiffs and their counsel pressed on, undeterred, and with utter disregard for the law and facts, not to mention for the rights of Defendants.

On May 13, 2022, this Court granted Defendants' Partial Motion for Summary Judgment of Correct Inventorship and No Inequitable Conduct (Dkt. No. 69), granted in part Defendants' Motion for Sanctions Pursuant to Rule 11 (Dkt. No. 73), and granted Defendants' Partial Motion for Summary Judgment of Infringement and Willfulness (Dkt. No. 76). *See* Dkt. No. 95 (the "Order").  Pursuant to the Order, Defendants respectfully move the Court for an award of monetary sanctions under Rule 11, and for an award of damages, including enhanced damages, owing to

---

[1] Three days after Plaintiff Imprenta's first action against Defendants was dismissed for lack of prosecution. *See Imprenta Servs., Inc. v. Karll, et al.*, No. 2:20-cv-01583 (C.D. Cal. filed Feb. 18, 2020), Doc. No. 15 (July 7, 2020 Ntc. of Dismissal).

Plaintiffs' willful infringement, and for a permanent injunction against such infringement which indeed continues to this day.

## II. DEFENDANTS' COSTS AND FEES FOR FILING THEIR MSJ OF CORRECT INVENTORSHIP AND NO INEQUITABLE CONDUCT AND THEIR MOTION FOR SANCTIONS

The Court has already concluded that "Rule 11 sanctions against Plaintiffs and their counsel are warranted for costs and fees incurred in connection with Defendants' inventorship and inequitable conduct motion for summary judgment and sanctions motion" and "ordered sanctions [that] are limited 'to what suffices to deter repetition of the conduct.'" Order, p. 22 (citing Fed. R. Civ. P. 11(b)(3), (c)(4). In doing so, the Court stated that the amount of sanctions is "not to exceed Defendants' costs and fees incurred for filing its inventorship and inequitable conduct motion for summary judgment and its motion for sanctions only (not the entire litigation)" and that "[d]epending on the reasonableness of the fees request and the totality of the circumstances, the Court will award monetary sanctions in an amount to be determined, up to but not greater than the fees and costs incurred for preparing these two motions." *Id.*, p. 19.

As shown in more detail in the Mackey Declaration and the Witkow Declaration (filed herewith), Defendants incurred a minimum of $141,776.91 in fees and costs for preparing and filing their inventorship and inequitable conduct motion for summary judgment and their motion for sanctions. Defendants are mindful of Rule 11 (c)(4) and trust the Court will agree that reasonable minds can differ as to what constitutes an expense incurred in "preparing" and filing a motion. Consequently, the break-up of fees and costs is laid out in more detail in the aforementioned declarations.

With the very ownership of the '375 Patent at stake, Defendants believe these expenses are well within the realm of reasonableness. This is especially true when one considers that failure to win on this issue could have resulted in not only Plaintiff

2

Sanchez being added as an inventor/owner, but also Defendant Karll being removed as an inventor/owner. *See* Complaint, ¶¶ 31 & 35. Indeed, loss on this issue could have resulted in Plaintiff Sanchez literally stealing Defendant Karll's invention and patent, which promises to be worth millions of dollars per year in sales for nearly the next twenty years. Thus, Defendants ask that the Court grant these expenses in full, as sanctions for Plaintiffs' bringing these claims that are "objectively baseless and lacking evidentiary support." Order, p. 19.

## III. DAMAGES

### A. REASONABLE ROYALTY DAMAGES

According to Plaintiffs limited disclosure of its actual sales of the Accused Products, as shown above, they have sold 268,530 of the 2G units and 48,000 of the 0.5G units, for a total infringing sales number of 316,530 of the Accused Products. *See* Mackey Decl., ¶ 2, & Ex. 1.

Specifically, as shown in Plaintiffs' document production (IMP005663), Plaintiffs made the following sales since December 2019:

| Date | Model | Quantity | $/Unit | Total $ |
|------|-------|----------|--------|---------|
| January 15, 2020 | 2G | 24,000 | $0.45 | $10,800 |
| January 15, 2020 | 2G | 24,000 | $0.57 | $13,680 |
| February 20, 2020 | 2G | 530 | $1.00 | $530.00 |
| November 3, 2020 | 0.5G | 18,000 | $1.16 | $20,880 |
| February 25, 2021 | 2G | 100,000 | $0.62 | $62,000 |
| July 23, 2021 | 0.5G | 30,000 | $0.89 | $26,700 |
| September 13, 2021 | 2G | 120,000 | $0.83 | $99,600 |
|  | Totals | 316,530 |  | $234,190 |
|  | 2G Totals | 268,530 |  | $186,610 |
|  | 0.5G Totals | 48,000 |  | $47,580 *Id.* |

Because this Court has found that all of the Accused Products infringe the '375 Patent, at least these 316,530 units of the Accused Products sold by Plaintiffs represent the Royalty Base.[2]

In August 2018, the parties agreed to a $0.05/unit royalty a license to the inventions eventually claimed in the '375 Patent.  Declaration of Nicholas Patrick Karll ("Karl Decl."), ¶2 & Ex. 1.  However, that was before the '375 Patent issued in December of 2019.  Indeed, that was before the application that matured into the '375 Patent was even filed in April 2019.   In fact, none of the related patents had actually issued at that time.

Rather, the '375 Patent claims priority to two U.S. patent applications: Ser. Nos. 15/951,482 (the '482 application) and 16/011,267 (the '267 application).  The '482 application was filed on April 12, 2018.  The '267 application was filed on June 18, 2018.  Neither application had even been examined in August 2018.  Thus, Defendants had no issued patents and only had two pending unexamined applications in August 2018.  Yet, Plaintiffs were insisting on a license.  *Id*.

Furthermore, in August 2018, Defendants were still trying to salvage their business relationship with Plaintiffs.  *Id*.  Therefore, $0.05/unit royalty rate, agreed on in August 2018, does not reflect a reasonable royalty for a license to the '375 Patent.

Determination of a reasonable royalty is typically based on the hypothetical negotiation framework set forth in the well-known case of *Georgia-Pacific Corp. vs. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (SDNY 1970).  *See, e.g.,*

---

[2] Plaintiffs' latest document production relevant to their sales of the Accused Products reflects a last sale of the Accused Products on September 13, 2021.  Plaintiff Sanchez testified at his deposition that "I'm guessing we have" sold the Accused Products since September of 2021.  Deposition of Plaintiff Sanchez, Dkt. No. 86-2, p. 17 of 103 (deposition transcript "Sanchez Depo.", p. 48:19-24).  In fact, Plaintiffs' website has continued to offer the Accused Products for sale as of at least June 2, 2022.  Mackey Decl., ¶ 3 & Ex. 2.  Thus, these damages calculations do not reflect sales not shown in Plaintiffs' document production.

4

witkow | baskin

*CAO Lighting, Inc. v. Feit Elec. Co.*, 2022 U.S. Dist. LEXIS 91642 * 21 (C.D. Cal. February 14, 2022).  In determining reasonable royalties for a license to the Asserted Patent, a hypothetical license scenario is considered in which the parties would have negotiated the terms of a nonexclusive hypothetical license to the Asserted Patent. The determination of damages based on a reasonable royalty is generally based on a hypothetical negotiation between a willing licensor and a willing licensee at or about the time of first infringement. With respect to this hypothetical willing licensor/licensee negotiation, courts have established a number of factors to be considered, including the *Georgia-Pacific* factors.

The reasonable royalty analysis focuses on the economic and bargaining positions of Defendants and Plaintiffs at the time of the hypothetical negotiation and the likely outcome of such negotiation given their respective bargaining positions. In calculating reasonable royalty damages, generally a determination is made regarding: (i) the reasonable royalty rate; and (ii) the appropriate royalty base. While *Georgia-Pacific* enumerates various factors that can be considered in determining reasonable royalties, the *Georgia-Pacific* factors are not absolute determinants of a reasonable royalty, but rather are guidelines to evaluating the likely actions of the parties in a hypothetical negotiation. Based on the facts and circumstances of the case, the *Georgia-Pacific* factors are not necessarily given equal weight nor are they all-inclusive. Rather, the *Georgia-Pacific* factors are part of the overall analysis of reasonable royalty damages.

The hypothetical negotiation would have occurred on the latter of: (i) the date the infringed patent(s) issued; or (ii) the date the infringing product(s) was first imported into, or made, used, offered for sale, or sold in, the United States.  At least because the '375 Patent issued on December 24, 2019 and Plaintiffs were offering the Accused Products for sale at that time, the hypothetical negotiation between Defendants and Plaintiffs would have occurred on or about December 24, 2019. The

hypothetical negotiation would have involved negotiations regarding a license to the Asserted Patent.

While the following discussion is organized on a per factor basis for purposes of clarity and convenience, the discussion for each factor is not necessarily limited to only that factor and may be relevant to one or more other factors as well.

### GEORGIA-PACIFIC FACTOR NO. 1

*The royalties received by the patentee for the licensing of the patent-in-suit, proving or tending to prove an established royalty.*

Defendants have not yet entered into any comparable or relevant express patent license agreement that provides rights to the Asserted Patent.  Thus, this factor is inapplicable here.

### GEORGIA-PACIFIC FACTOR NO. 2

*The rates paid by the licensee for the use of other patents comparable to the patent-in-suit.*

Plaintiffs have not produced any license agreements, nor have Defendants identified any such licenses.  Thus, this factor is inapplicable here.

### GEORGIA-PACIFIC FACTOR NO. 3

*The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.*

Defendants contend that any license agreement reached in a hypothetical negotiation under *Georgia-Pacific* would provide a non-exclusive right to make, use, sell, offer to sell and/or import products within the United States.  Defendants also contend that any license agreement would necessarily include all related pending applications, and any later filed applications.  A license to anything less would be ineffective as it would not provide any right to make, use, sell, offer to sell and/or import the Accused Products within the United States.

Both the '482 application and the '267 application were still pending on December 24, 2019. The '267 application issued as U.S. Patent No. 11,040,808 (the '808 Patent) on June 2, 2021. U.S. Patent Application No. 16/726,152 (the '152 application) was filed on December 23, 2019 and is currently pending. The '375 Patent and all three pending applications, as well as any application to be filed in the future, would necessarily have been covered by any license agreement reached in a hypothetical negotiation on December 24, 2019, because any license would have included all patents and applications claiming priority to the '482 application.

Thus, any license agreement reached in a hypothetical negotiation under Georgia-Pacific, on December 24, 2019, would include the '375 patent, three pending applications, and any related applications to be filed in the future. This stands in stark contrast to just the two pending applications at the time of the August 2018 agreement to a $0.05/unit royalty rate. Karl Decl., ¶2 & Ex. 1. Thus, this factor would indicate a significantly higher reasonable royalty than $0.05/unit.

**GEORGIA-PACIFIC FACTOR NO. 4**

*The licensor's established policy and marketing program to maintain its patent monopoly by not licensing others to use the invention or by gaining licenses under special conditions designed to preserve that monopoly.*

Defendants have not entered into any express patent license agreements that provide rights to the Asserted Patent. Because there are no licenses to the Asserted Patent, there would have been no restrictions relating to territories in which rights could have been licensed. Thus, this factor is neutral here.

**GEORGIA-PACIFIC FACTOR NO. 5**

*The commercial relationship between the licensor and the licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.*

The parties are and were competitors in the same territory in the same line of business on December 24, 2019. Karl Decl., ¶ 3. The parties both sell containers

7

throughout the United States to, for example, customers in the cannabis industry. *Id*. Leading up to the time of the hypothetical negotiation, Plaintiffs had previously supplied containers to Defendants at Defendants' request but Defendants had been forced to change suppliers when the manufacturer utilized by Plaintiffs was unable to produce the containers within commercially acceptable failure rates. *Id*. In fact, Plaintiffs have been in contact with at least one Defendants' customers and/or potential customers and have submitted competing bids to at least one customer. *Id*.; *See also* Deposition of Plaintiff Sanchez, Dkt. No. 86-2, p. 51 of 103 (deposition transcript "Sanchez Depo.", p. 184:3-22) ("Kiva, who I believe used to be or still is a client of Eco-Packaging, they were hot to trot with us.").

Thus, on December 24, 2019, the hypothetical negotiation would have been between direct competitors with a former, soured business relationship. As a result, this factor would push the reasonable royalty considerably higher than the $0.05/unit royalty rate agreed on when the parties were in an on-going business relationship.

**GEORGIA-PACIFIC FACTOR NO. 6**

*The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of its non-patented items; and the extent of such derivative or convoyed sales.*

Plaintiffs advertise a large variety of products on their website, alongside the Accused Products. Mackey Decl., ¶ 3 & Ex. 2. However, Plaintiffs have not produced any documents from which Defendants can identify derivative or convoyed sales or the lack thereof. Thus, this factor is at least neutral, but would likely pressure any reasonable royalty higher if Plaintiffs had been more forthcoming in their document production.

**GEORGIA-PACIFIC FACTOR NO. 7**

*The duration of the patent and the term of the license.*

**MOTION FOR ATTORNEY'S FEES AND DAMAGES**

The '375 Patent is enforceable from December 24, 2019 to April 12, 2038. The '808 Patent is enforceable from June 2, 2021 to April 12, 2038.

A license resulting from the hypothetical negotiation would have been for at least the full term of the Asserted Patent and the '808 Patent, as well as any patent that may issue from the '152 application, and therefore will continue at least until April 12, 2038.  At least because the duration of the patents and thus term of the license was for the full term of the patents, this factor would pressure any reasonable royalty higher.

### GEORGIA-PACIFIC FACTOR NO. 8

*The established profitability of the product made under the patent; its commercial success; and its current popularity.*

According to Plaintiffs' document production, they sold 48,000 of the 0.5G units for a total of $47,580.  *See* Mackey Decl., ¶ 2, & Ex. 1.  This equates to just over $0.99/unit gross sales for the 0.5G units.  More specifically, on November 3, 2020, Plaintiffs sold 18,000 0.5G units for $1.16 each or $20,880 in total.  *Id*.  On July 23, 2021 Plaintiffs sold 30,000 0.5 units for $0.89 each of $26,700 in total.  *Id*. Plaintiffs produced an email that shows their costs to be $0.365 (0.155 + 0.21) each for up to 20,000 0.5G units and $0.355 (0.15 + 0.205) each for 30,000 0.5G units. *See* Mackey Decl., ¶ 4 & Ex. 3.  Thus, Plaintiffs total costs for those 48,000 0.5G units was $17,220.  As a result, Plaintiffs' gross profits from those sales was $30,360 or about $0.64/unit.  This equates to an approximately 64% profit margin.

According to Plaintiffs' document production, they sold 268,530 of the 2G units for a total of $186,610.  *See* Mackey Decl., ¶ 2, & Ex. 1.  This equates to about $0.69/unit gross sales.  Plaintiffs have not produced any documentation of their costs for the 2G units.  Applying the same profit margin of 64%, that equates to gross profits of $119,430.40 or just over $0.44/unit.  Even applying half the 64% profit margin of the 0.5G units to these 2G units, Plaintiffs' gross profits from these sales would be $59,715.20 or just over $0.22/unit.

9

Thus, Plaintiffs' average profit per unit, across all Accused Products, appears to be between about $0.64 and about $0.22.  Defendants' average profit per unit is about $0.17.  Karl Decl., ¶ 4.  Thus, this factor would indicate a significantly higher reasonable royalty than $0.05/unit.

### GEORGIA-PACIFIC FACTOR NO. 9

*The utility and advantage of the patent property over the old modes or devices, if any, that had been used for working out similar results.*
[Discussed below].

### GEORGIA-PACIFIC FACTOR NO. 10

*The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.*

*Georgia-Pacific* factors Nos. 9 and 10 are typically analyzed together given the overlap in the subject matter covered by these two factors.

Defendants contend that the claims of the Asserted Patent provide significant benefits and advancements in the field of recyclable, child-resistant packaging. Such contentions are supported by the evidence of record.  For example, Plaintiffs have copied Defendants' patented invention and apparently make an average profit per unit between about $0.64 and about $0.22.  *See* the discussion above relating to *Georgia-Pacific* factor 8.

Plaintiffs have not identified, and Defendants are not aware of, any non-infringing alternatives that provided the same or similar benefits and functionalities as did the Asserted Patent as of the date of first infringement. Thus, these factors would indicate a significantly higher reasonable royalty than $0.05/unit.

### GEORGIA-PACIFIC FACTOR NO. 11

*The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.*

---

10

**MOTION FOR ATTORNEY'S FEES AND DAMAGES**

Plaintiffs' use of the invention of the Asserted Patent has been widespread and financially rewarding. *See also* the discussion above relating to *Georgia-Pacific* factor 8. For example, Plaintiffs have simply copied Defendants' patented invention and apparently make an average profit per unit between about $0.64 and about $0.22. Thus, this factor would indicate a significantly higher reasonable royalty than $0.05/unit.

## GEORGIA-PACIFIC FACTOR NO. 12

*The portion of the profit or selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.*

As discussed above with respect to *Georgia-Pacific* factor 8, Plaintiffs' average profit per unit appears to be between about $0.64 and about $0.22. Defendants' average profits per unit is about $0.17. Karl Decl., ¶ 4. Thus, this factor would indicate a significantly higher reasonable royalty than $0.05/unit.

## GEORGIA-PACIFIC FACTOR NO. 13

*The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.*

Defendants believe that all of Plaintiffs' sales of the Accused Products, and resulting profits, are attributable to the Asserted Patent. For example, Plaintiffs have wholly copied Defendants' patented invention and products, and if the Asserted Patent were removed from the Accused Products, there would be little or nothing of any value left of those products. This is supported by Plaintiff Sanchez's deposition, where he testified that "[t]he lid is everything. The body is nothing. You can throw the body away. The body is common, it's -- the design of the lid is the whole key." Dkt. No. 86-2, p. 50 of 103 (Sanchez Depo., p. 180:5-8). Plaintiff Sanchez also

testified that "[f]igure 6 [of the '375 Patent] is the whole key to the – to making this product work." *Id*., 34 of 103 (p. 116:18-19).

Further, at least because Plaintiffs utilize a third-party manufacturer that ships directly to their customers, they bear little risk in the manufacture and distribution of the Accused Products.

Finally, Plaintiffs have not added any significant features or improvements to the Accused Products, at least none that are not also covered by the claims of the '357 Patent.   For example, during his deposition, Plaintiff Sanchez testified that they changed the design of the couplers to a "clock design." *See, e.g*., *Id*., p. 28 of 103 (p. 91:18-20).   Not only has the Court found the Accused Products with the "clock design" infringes the '375 Patent, Plaintiff Sanchez also testified that that "clock design" infringes claim 1 of the '375 Patent.   *Id*., p. 53 of 103(p. 192:1-6).   Thus, Plaintiffs have not added any significant features or improvements to the Accused Products that add value or are not covered by the '375 patent.   Thus, this factor would pressure any reasonable royalty higher.

**GEORGIA-PACIFIC FACTOR NO. 14**

*The opinion and testimony of qualified experts.*

No expert disclosures have been exchanged.   Thus, this factor is inapplicable here.

**GEORGIA-PACIFIC FACTOR NO. 15**

The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, that amount which a prudent licensee – who desires, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention – would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

Plaintiffs' average profit per 0.5G unit appears to be about $0.64 and Defendant's average profits per unit is about $0.17.  *See, e.g*, the discussion above relating to *Georgia-Pacific* factor 8; Karl Decl., ¶ 4.  A royalty rate of $0.17 per 0.5G unit would make Defendants whole and leave Plaintiffs with a profit of about $0.47/unit.  It cannot be reasonably argued that a ***willing*** licensee in Plaintiffs' position would forego the lion's share of these profits, almost three quarters, when the alternative would be to forego all of these profits.

Plaintiffs' average profit per 2G unit appears to be between about $0.44 and $0.22 and Defendant's average profits per unit is about $0.17.  *Id*.  A royalty rate of $0.17 per 0.5G unit would make Defendants whole and leave Plaintiffs with a profit of between $0.27/unit and $0.05/unit.  Of course, we cannot know Plaintiffs' actual profit margin because they have provided no cost data with respect to their 2G units.  It is not reasonable to suggest that Plaintiffs, or a ***willing*** licensee in their position, would forego significant profits, when the alternative would be to forego all of these profits.  This is especially the case, where as here, it would leave Plaintiffs with at least $0.05/unit, which is exactly the royalty they previously agreed upon, albeit in the other direction.

In each case, Defendants would have no motivation to accept anything less than their own profit margin, since their alternative would be to simply make the sales, and therefore profits, themselves.  This analysis would result in an actual damages amount of $53,810.10 for Plaintiff's infringing sales, given Plaintiffs' limited disclosure of its actual sales of the Accused Products.

## B.   LOST PROFITS DAMAGES

"When a patentee proves it would have made additional sales but for a defendant's infringement, the patentee is entitled to be made whole for the profits it proves it lost." *Sunoco Partners & Mktg. Terminals L.P. v. U.S. Venture, Inc*., 2022 U.S. App. LEXIS 11662 *34-35, 32 F.4th 1161 (Fed. Cir. 2022) (*quoting Mentor Graphics Corp. v. EVE-USA, Inc*., 851 F.3d 1275, 1284 (Fed. Cir. 2017)).

One useful method for assessing lost profits as a result of the alleged infringement is the four-factor test found in *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1164, 197 U.S.P.Q 424, 439 (6th Cir.1979) (the "*Panduit* analysis" with the factors commonly referred to as the "*Panduit* factors"). The factors identified in the *Panduit* analysis indicate economically important inquiries that should be made and the types of evidence that should be considered when assessing lost profits.

**PANDUIT FACTOR NO. 1**

*Demand for the patented product.*

The first *Panduit* factor assesses demand for the product that includes the technology described by the Asserted Patent. Demand exists for the products embodied by the Asserted Patent, as evidenced by Plaintiffs' sales of the Accused Products.  Specifically, as discussed above, Plaintiffs have sold at least 48,000 of the 0.5G units and 268,530 of the 2G units for a total infringing sales of at least 316,530 units of the Accused Products from December 2019 through Plaintiffs' last acknowledged sale of September 2021.  Of course, as discussed above, we have every reason to believe Plaintiffs have sold the Accused Products since September 2021. Defendants have sold far more.  Karl Decl., ¶ 5.

**PANDUIT FACTOR NO. 2**

*Absence of acceptable non-infringing alternatives.*

The second *Panduit* factor assesses whether there are any products that embody acceptable non-infringing substitutes for the technology described by the Asserted Patent.  As discussed above, Plaintiffs have not identified, and Defendants are not aware of, any non-infringing alternatives that provided the same or similar benefits and functionalities as did the Asserted Patent as of the date of first infringement.  Specifically, Defendants are not aware of any suitable recyclable and certified child-resistant containers suitable for use with cannabis products, for which the Accused Products are sold.

**PANDUIT FACTOR NO. 3**

*Manufacturing and marketing capability to exploit the demand.*

The third *Panduit* factor examines if the patent owner has the appropriate manufacturing and marketing capabilities to have made the alleged infringing sales. This not only examines whether the patent owner had sufficient manufacturing capability to produce the products but also examines whether the infringer's customers would have known about the patent owner's products and been able to purchase those products.

Both parties utilize third-party manufacturers. Thus, in this case, this factor is not about the manufacturing and marketing capability of the parties themselves. Rather, this factor speaks to Defendant's ability to find sufficient manufacturing services from third-party manufacturers. Defendants initially purchased manufacturing services through Plaintiffs. Karl Decl., ¶ 2. However, quality control issues forced Defendants to look elsewhere for manufacturing services in 2019. *Id*. Since December 2019, Defendants have maintained manufacturing services relationships with at least two manufacturers at any given time capable of manufacturing their containers covered by the '375 Patent. *Id*., ¶ 5. Defendants have had as many as 1,690,000 units fulfilled by a single manufacturer. *Id*. In contrast, as discussed above, Plaintiffs' largest order of Accused Products appears to be for 120,000 2G units in September 2021. Mackey Decl., ¶ 2, & Ex. 1. Thus, Defendants had sufficient manufacturing services available from third-party manufacturers to make each and every one of Plaintiffs' sales of the Accused Products.

Both parties sell their products through websites, both of which have worldwide reach. Thus, both parties marketing efforts are virtually identical. Thus, Defendants had manufacturing and marketing capability to exploit the demand.

**PANDUIT FACTOR NO. 4**

*The amount of profit it would have made.*

The fourth *Panduit* factor pertains to quantification of the lost profits. Generally lost profits are quantified by the difference between the lost revenue and the costs associated with generating the lost revenue. In this case, lost revenue could be determined by multiplying the price Defendants would have received from selling additional products by the number of products Defendants would have sold if the Accused Products were not on the market. The costs associated with generating lost revenue can be determined by estimating the costs Defendants would have incurred to generate the lost revenue. Lost profits can also be determined by multiplying the number of products that would have been purchased by Plaintiffs' customers by the profit per unit Defendants would have earned from those sales.

As shown in Karl Decl., ¶ 4 & Ex. 2., Defendants make a profit of $0.17/unit, for both their 0.5G and 2G units.  Plaintiffs sold 48,000 of the 0.5G units and 268,530 of the 2G units, for a total of 316,530 units.  This analysis would result in an actual damages amount of $53,810.10 for Plaintiff's infringing sales, given Plaintiffs' limited disclosure of its actual sales of the Accused Products.

## IV.   ENHANCED DAMAGES

Defendants' Motion for Partial Summary Judgment of Infringement and Willfulness, Dkt. No. 76 (the "Motion"), identified the factors used in determining whether to award enhanced damages for willfulness: "(1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; [] (3) [the nature of] the infringer's behavior as a party to the litigation;" "(4) Defendant's size and financial condition;" "(5) Closeness of the case;" "(6) Duration of defendant's misconduct;" "(7) Remedial action by the defendant;" "(8) Defendant's motivation for harm;" and "(9) Whether defendant attempted to conceal its misconduct." *Rsa Protective Techs. v. Delta Sci. Corp.*, No. CV19-6024, 2021 U.S. Dist. LEXIS 209396, at *15 (C.D. Cal. Oct. 20, 2021) (*quoting Read Corp. v. Portec, Inc.*, 970

16

F.2d 816, 827 (Fed. Cir. 1992) (aka the *Read* factors).  On pages 16-19, the Motion explains how: Plaintiffs deliberately copied Defendant Karll's Design, both before and after the '375 Patent issued (factor 1); Plaintiffs never tried to analyze their infringement and brought no invalidity claim (factor 2); this is not a close case (factor 5); and Plaintiffs have taken no remedial action (factor 7).

On pages 18 and 19, the Motion cites several cases where the Federal Circuit affirmed an award of double damages where infringement continued after the filing of the suit.  Here, Plaintiffs have continued offer the Accused Products for sale, even after a finding of infringement.  *See* https://www.tinkingusa.com/; https://www.tinkingusa.com/catalog/; *see also* Mackey Decl., ¶ 3 & Ex. 2.  Thus, the question is whether the Court should award treble damages instead of mere double damages.  Defendants believe that several additional factors weight in favor of treble damages.

### A.   LITIGATION MISCONDUCT

*Read* factor 3 considers Plaintiffs' behavior as a party to the litigation.  "Typically, 'litigation misconduct' refers to bringing vexatious or unjustified suits, discovery abuses, failure to obey orders of the court, or acts that unnecessarily prolong litigation." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 859 (Fed. Cir. 2010).  This Court has already found "portions of the Complaint objectively baseless and lacking evidentiary support."  Order, p. 19-20.  In fact, the Court has found Plaintiffs' behavior as a party to the litigation to warrant sanctions under Rule 11.  Order, p. 19.

In addition to the sanctionable conduct, rather than simply conceding infringement, Plaintiffs continued to advance a frivolous non-infringement position based solely on claim constructions this Court had already rejected.   Order, p. 26-27.  Thus, Plaintiff's behavior as a party to the litigation with respect to their infringement, as well as their inventorship and inequitable conduct, claims has been

unjustified and has unnecessarily prolonged this litigation since at least this Court's Claim Construction Order, Dkt. No. 51.

Finally, Plaintiffs' have engaged in a variety of discovery abuses, forcing Defendants to file a motion to compel discovery, which the Magistrate Judge granted. *See, e.g.*, Dkt. Nos. 57, 61, 62 & 64.   As a result, Plaintiffs' behavior as a party to the litigation (*Read* factor 3) weighs in favor of trebling damages.

## B.   SIZE AND FINANCIAL CONDITION

*Read* factor 4 considers Plaintiffs' size and financial condition.  Here, Plaintiffs and Defendants are roughly the same size, such that neither party is a giant in comparison with the other.  As shown above in the discussion of actual damages, the damages are not into the millions, or even approaching six figures, and therefore trebling them is not the kind of thing that would cripple Plaintiff's legitimate business.  Thus, this factor is at least neutral.

## C.   DURATION OF MISCONDUCT

*Read* factor 6 considers the duration of Plaintiffs' misconduct.  The '375 Patent issued on December 24, 2019, and Defendants immediately notified Plaintiffs thereof.  Plaintiffs continue to offer the Accused Products for sale, even after a finding of infringement.    *See*    https://www.tinkingusa.com/; https://www.tinkingusa.com/catalog/; *see also* Mackey Decl., ¶ 3 & Ex. 2.  Thus, Plaintiffs' misconduct has spanned roughly two and a half years, and continues.

Misconduct between a first infringement of October 2017 and a December 2019 trial has been found to "weigh in favor of enhancement." *Juno Therapeutics, Inc. v. Kite Pharma, Inc*., 2020 U.S. Dist. LEXIS 83014 at 9-10, 26, and 37-38 (C.D. Cal. Apr. 2, 2020).  "[I]nfringing conduct [that] continued for over a year after [receiving notice] weighs in favor of trebling damages." *Top Lighting Corp. v. Linco, Inc*., 2019 U.S. Dist. LEXIS 239303 at 15 (C.D. Cal. August 26, 2019).  Thus, the duration of Plaintiffs' misconduct (*Read* factor 6) weighs in favor of trebling damages.

### D.   MOTIVATION FOR HARM

*Read* factor 8 considers Plaintiffs' motivation for harm.   "This factor is typically viewed as supporting enhanced damages where 'the infringer engages in infringing conduct to gain an edge over the patentee in a competitive market.'"   *Pavo Solutions Llc v. Kingston Tech. Co*., 2021 U.S. Dist. LEXIS 139185 at 40 (C.D. Cal. February 16, 2021) (*citing, Funai Elec. Co. v. Daewoo Elecs. Corp*., 593 F. Supp. 2d 1088, 1116 (N.D. Cal. 2009), *aff'd*, 616 F.3d 1357 (Fed. Cir. 2010)).

Here, not only have Plaintiffs deliberately and willfully ignored Defendant Karll's patent rights, they have actually attempted to steal those rights in their entirety.   *See* Complaint, ¶ 31 ("Plaintiff Mike Sanchez, president of Plaintiff Imprenta, is and believes himself to be the first, true, and original inventor of the inventions claimed in the '375 Patent."); *Id.,* ¶ 35 ("Defendant Karll is, through error, named in the '375 Patent as an inventor.").   Clearly, stealing Defendant Karll's patent rights would necessarily grant Plaintiffs an overwhelming edge in the market, much more so than merely prematurely seizing market share or other forms of improper competition.   Rather, stealing Defendant Karll's patent rights would turn the tables with respect to a patentee's right to exclude, allowing Plaintiffs to completely exclude Defendants from the market.   Defendants can conceive of no greater harm Plaintiffs could possibly inflict.   Thus, Plaintiffs' motivation for harm (*Read* factor 8) weighs in favor of trebling damages.

### E.   ATTEMPT TO CONCEAL MISCONDUCT

*Read* factor 9 considers whether Plaintiffs' attempted to conceal their misconduct.   Where the infringer "failed to preserve its records and had failed to cooperate as it should at the trial on the issue of damages," this factor weighs in favor of enhanced damages.   *Read*, 970 F.2d at 827; *see also Top Lighting*, 2019 U.S. Dist. LEXIS 239303 at 15 ("refusal to provide product invoices," among other things "weighs in favor of trebling damages.")

Here, Plaintiffs forced Furthermore, while Plaintiffs have produced cost data relating to their sales of the 0.5G version of the Accused Products, they have produced nothing showing their costs related to their sales of the 2G units. Finally, Plaintiffs' document production, as of close of discovery on January 14, 2022, only shows sales from January 15, 2020 through September 13, 2021. Yet, Plaintiffs' website still offers the Accused Products for sale. Mackey Decl., ¶ 3 & Ex. 2. Therefore, it is certain that they have failed to comply with their discovery responsibilities on the issue of damages, at least with respect to their costs of their 2G units, convoyed sales, and very likely with respect to sales after September 13, 2021. Thus, Plaintiffs' attempts to conceal their misconduct (*Read* factor 9) weighs in favor of trebling damages.

### F. SUMMATION

As shown in the Motion, *Read* factors 1, 2, 5, and 7 all weight in favor of enhanced damages. As shown above *Read* factors 3, 6, 8, and 9 also weight in favor of enhanced damages. *Read* factor 4 is at least neutral. Thus, with almost all of the *Read* factors clearly weighing in favor of enhancing damages, and none clearly weighing against enhanced damages, Defendants ask this Court to treble the damages shown above.

## V. INJUNCTION

35 U.S.C. § 283 recognizes this Court's power to grant an injunction to prevent the violation of Defendant Karll's right secured by the '375 Patent. "A party seeking a permanent injunction for patent infringement must demonstrate: '(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.'" *Sionyx LLC v. Hamamatsu Photonics K.K.*, 981 F.3d 1339, 1348 (Fed.

Cir. 2020) (*citing eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 390-91, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006)).

### A.   IRREPARABLE HARM

 "[T]o satisfy the irreparable harm factor in a patent infringement suit, a patentee must establish both of the following requirements: 1) that absent an injunction, it will suffer irreparable harm, and 2) that a sufficiently strong causal nexus relates the alleged harm to the alleged infringement." *Apple Inc. v. Samsung Elecs. Co.*, 695 F.3d 1370, 1374 (Fed. Cir. 2012). Here, Defendants suffer irreparable harm in at least two ways. First, the parties are direct competitors, selling products covered by the '375 Patent to the exact same markets, i.e. child-proof containers for the cannabis industry. *See, e.g.*, Mackey Decl., ¶ 3 & Ex. 2. Thus, every sale Plaintiffs make, every share of the market occupied by Plaintiffs, is a direct completive loss to Defendants. *See, e.g., i4i*, 598 F.3d at 861-62. The child-proof features claimed in the '375 Patent are precisely what makes Defendants' products, and the Accused Products, successful in the market, and therefore the nexus is clear. *See, e.g.*, Dkt. No. 86-2, pp. 34 and 50 of 103 (Sanchez Depo., pp. 116:18-19 ("Figure 6 [of the '375 Patent] is the whole key to the – to making this product work.") and 180:5-8 ("the design of the lid is the whole key")).

 Second, the one key difference between the products sold by Plaintiffs and Defendants is the poor quality of Plaintiffs' products, which is why Defendants were forced to termination the business relationship between the parties. If Defendants' were forced to license Plaintiffs' products, Defendants would be forced to require Plaintiffs to mark their products with the '375 Patent. *See, e.g.*, 35 U.S.C. § 287(a). Plaintiffs' quality problems would tarnish Defendants' products also marked with the '375 Patent. Thus, this first factor weighs in favor of granting a permanent injunction.

### B.   INADEQUATE REMEDIES AVAILABLE AT LAW

The remedies available at law, such as monetary damages, are simply inadequate to compensate Defendants for the injury Plaintiffs' continued use of the "375 Patent causes. Defendants have no ability to enforce quality control standards on Plaintiffs. This is why Defendants were forced to sever the business relationship years ago. As mentioned above, Plaintiffs' quality problems would tarnish Defendants' products also marked with the '375 Patent. This would cause Defendants to lose even more market share to other competitive products. Simply put, Plaintiffs sales of the Accused Products has caused Defendants "to suffer a loss of market share, brand recognition, and customer goodwill." *See, e.g., i4i*, 598 F.3d at 862. Any continued sales by Plaintiffs of the Accused Products can only erode Defendants market share further. If Plaintiffs are allowed to sell the Accused Products marked with the '375 Patent, that can only tarnish Defendant's brand recognition and diminish customer goodwill across the market. Thus, this second factor also weighs in favor of granting a permanent injunction.

## C.   BALANCE OF HARDSHIPS

The balance of hardships also weighs in favor an injunction. Just as in *i4i*, as the patentee here, Defendant's "business is comprised 'almost exclusively' of products based on the" '375 Patent. *Id*. In contrast, Plaintiffs' website touts that "Tin King USA provides many types of quality premium and promotional products in addition to containers." Mackey Decl., ¶ 3 & Ex. 2. This in addition to the variety of containers, not all of which are even child-resistant, Plaintiffs offer. *Id*.

Furthermore, Plaintiffs have shown, throughout this litigation, that they have no intention of treating Defendants fairly and honestly. Thus, Defendants would be forced to attempt to enforce a Court ordered licensing agreement against a combative licensee. Surely, the Court can recognize the hardship that would impose on Defendants, at least in attempting to audit sales data (which Plaintiffs have not fully provided here), enforce quality standards (which Plaintiffs have shown an inability to meet) and ensure adequate marking of Plaintiffs products.

### D.   THE PUBLIC INTEREST

Finally, there is nothing to suggest that the public interest would be disserved by a permanent injunction.  Article I, Section 8, of the U.S. Constitution lays the foundation for the exclusivity rights granted by a U.S. Patent.  Defendant Karll is the rightful inventor, and therefore has the right to exclude Plaintiffs from practicing the inventions claimed in the '375 Patent.  This Court has the power to grant a permanent injunction to protect Defendant Karll's right secured by the '375 Patent.  The above factors weigh in favor of granting that injunction, and Plaintiffs can point to nothing, other than their own self-interest, that would weigh against granting that injunction.  Thus, Defendants ask the Court to grant a permanent injunction preventing Plaintiffs from continuing to sell the Accused Products and anything falling within the scope of the claims of the '375 Patent.

## VI.   CONCLUSION

For at least the reasons discussed above, Defendants request the Court to award its costs and fees as well as damages, in the amounts shown above, treble those damages to deter future willful infringement, and enjoin Plaintiffs' future infringement.

Dated: June 3, 2022                    Respectfully submitted,

                                       witkow | baskin
                                       Mackey Law Firm PLLC

                                       By: /s/ Michael C. Mackey
                                       Brandon J. Witkow
                                       Cole Mackey

                                       *Attorneys for Defendants*
                                       NICHOLAS PATRICK KARLL & ECO
                                       PACKAGING SOLUTIONS